LOUIS J. RUSSO, APPELLANT, v. THE GOVERNOR OF THE STATE OF NEW JERSEY, RESPONDENT.

Argued May 14, 1956—Decided June 25, 1956.

158

*Mr. George Pellettieri* argued the cause for the appellant (*Messrs. Pellettieri and Rabstein,* attorneys).

*Mr. Harold Kolovsky,* Assistant Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, *Mr. John F. Crane* on the brief).

The opinion of the court was delivered by VANDERBILT, C. J.

## I.

This is an appeal from an order of the Governor removing Louis J. Russo from his position as Assistant Chief Examiner in the Department of Civil Service for misconduct in office while he held the position of Chief Examiner and Secretary. The order was made pursuant to an exercise of the authority granted to the Governor by *Article* V, *Section* IV, *paragraph* 5 of the Constitution which provides:

"The Governor may cause an investigation to be made of the conduct in office of any officer or employee who receives his compensation from the State of New Jersey, except a member, officer or employee of the Legislature or an officer elected by the Senate and General Assembly in joint meeting, or a judicial officer. He may require such officers or employees to submit to him a written statement or statements, under oath, of such information as he may call for relating to the conduct of their respective offices or employments. After notice, the service of charges and an opportunity to be heard at public hearing the Governor may remove any such officer or employee for cause. Such officer or employee shall have the right of judicial review, on both the law and the facts, in such manner as shall be provided by law."

An appeal was taken from the order of removal to the Appellate Division of the Superior Court as authorized by the statute implementing the constitutional provision, *N. J. S. A.* 52:14–17.2, and we then certified the matter on our own motion while it was pending there.

On March 18, 1954 the Governor appointed H. Norman Schwarzkopf to investigate into the management and affairs of the Division of Employment Security in the Department

of Labor and Industry. As a result of that inquiry evidence was obtained tending to indicate misconduct on the part of Russo in the submission by him to the Division of Employment Security of vouchers for alleged overtime work for that division while he was employed by the Department of Civil Service. These invoices resulted in the payment to him of $1,000 a year during the period from July 1, 1948 to June 30, 1953. He was suspended from his position by executive order on June 18, 1954, pending the hearing and determination of the charges against him. The propriety of that action by the Governor was considered by this court and upheld in *Russo v. Walsh*, 18 *N. J.* 205 (1955).

The formal charges against Russo alleged that in his official capacity as Chief Examiner and Secretary Russo "did commit malfeasance in office founded on improper and illegal conduct" and "did commit acts amounting to misconduct and misfeasance in his official capacity founded upon his breach of good faith, trust and right action impliedly required of his official position and upon the performance of his official duties as said Chief Examiner and Secretary in the Department of Civil Service, in an improper and illegal manner." The specifications alleged the submission of invoices for overtime services to the extent of $5,000 "while employed as Chief Examiner and Secretary and/or Assistant Chief Examiner" and that his acts "were fraudulently, willfully, unlawfully and knowingly committed * * * and constituted malfeasance and misfeasance in his said official capacity." Further specifications charged Russo with not having performed the services for which he had billed the State and that he was not entitled to receive any such payments in any of the capacities in which he was employed by the State. The charge that Russo had not performed these overtime services was abandoned at the hearing and the Governor's finding of misconduct was limited to the period during which Russo held the position of Chief Examiner and Secretary.

The Governor appointed Mr. Augustus C. Studer, Jr., of the New Jersey bar, to conduct a hearing on the charges

and report his findings to the Governor together with his recommendations. At the conclusion of the Governor's case counsel for Russo moved for a dismissal of the charges, and the introduction of the defendant's case was held in abeyance pending the determination of that motion. Mr. Studer then submitted his report to the Governor, recommending that the motion be granted and the charges dismissed. Mr. Studer's findings were in part as follows:

"The proof fails to show that Russo acted fraudulently. It shows merely that during a portion of his tenure in office, partly as Chief Examiner and Secretary of the Department of Civil Service, and partly as Assistant Chief Examiner of the Department of Civil Service, he performed certain work for the Division of Employment Security, for which he was paid and which payment was approved by his superiors.

From a consideration of the evidence adduced to sustain the charges made against Russo, your representative finds that the acts of Russo specified by the State as constituting malfeasance and misfeasance in his official capacity, were not fraudulently, willfully, unlawfully and knowingly committed by him. Accordingly, your representative finds that the State has failed to establish a *prima facie* case in proof of the charges before him."

Exceptions to this report were filed by counsel for the Governor and thereafter oral argument on those exceptions were heard by the Governor personally. The Governor sustained the exceptions and denied the defendant's motion to dismiss.

In his determination the Governor held that the payments to Russo were clearly illegal; that as Chief Examiner and Secretary Russo's salary was to be "as provided in the annual appropriation law," (*R. S.* 11:2–1) and that as such Chief Examiner and Secretary he could "hold no other public office or employment" except as an unpaid officer "or as director of any *quasi*-public or other corporation," (*R. S.* 11:2–2); that Russo's position that he did not violate the law was unsustainable either on the basis that he performed services for the Department of Employment Security apart from his duties as Chief Examiner or on the basis that he performed them in the discharge of his official duties as Chief Examiner, holding that on the first basis he would

violate *R. S.* 11:2–2 and on the second basis he would violate *R. S.* 11:2–1. The Governor held that although the statutory authority for overtime pay prior to the passage of *chapter* 51, *Laws of* 1951, was obscure, the committee created by that act set up regulations for the exclusion from overtime payments any position for which the work week was classified as "indefinite." He held that Russo plainly came within that class and therefore overtime pay for him as Chief Examiner and Secretary was clearly foreclosed.

Mr. Studer was then relieved from any further duties in the case and the hearing of the balance of the proceedings, the defendant's case, was conducted before the Governor personally.

Initially, in the proceedings before the Governor's appointee, Russo made application for an extensive inspection of certain documents and records of the State pertaining in some respects to the matters in issue. That relief was neither granted nor withheld. After the Governor took over the hearing of the matter personally, and prior to the hearing of the defendant's case, counsel for Russo made application to the Governor seeking the inspection and production of records of the Department of Civil Service and other state departments dealing with the matters upon which Russo's claims for overtime services were based, and dealing also with the records of payments for overtime services made to other state employees for performing work in connection with the administration of this system. The application was generally granted but was limited to the matters relating specifically to Russo. In his letter opinion the Governor stated:

"It is appropriate to refer to the sweeping application for inspection of all records relating to payment of overtime to State employees and officers both in connection with the joint merit system and independent of it. I gather that two purposes are sought to be advanced: (a) to support a claim that Mr. Russo acted in good faith and (b) to establish a custom or practice.

Without now determining the legal efficacy of the claim of good faith, it seems clear that insofar as Mr. Russo may assert that he relied upon payments to others, the crux is the state of his knowledge or information at the time of his challenged conduct, and not such knowledge or information as may perhaps be gleaned by a present

inspection. No affidavit having been filed in support of the motion indicating the state of Mr. Russo's knowledge or information, the inspection would become a roving investigation without any apparent purpose. It is unlikely that the production of such records could have any bearing beyond testing the sincerity of the claim of good faith. In any event, if Mr. Russo's testimony or other developments at the hearing should indicate the necessity or desirability of examining records relating to specific situations upon which he should testify that he relied, the application to inspect may then be renewed before me.

The second asserted objective, namely, to prove custom or practice, is without legal basis. If Mr. Russo is guilty of the charges against him, it is no defense that someone else may also be amenable in like proceedings. Nor can the clear meaning of a statute or regulation be altered by proof of conduct in violation of it."

Thereafter, the defendant sought the issuance of *subpoenas duces tecum* directed to the 13 department heads who constitute the Governor's cabinet directing them to produce their departmental records covering their employees of Russo's classification who had received extra pay or overtime pay during the period covered by the charges. This the Governor likewise declined to do. At the opening of the hearing before the Governor, this matter was again raised by the defendant's counsel, but denied by the Governor. The following portion of the transcript is helpful in undertsanding the positions taken by the respective parties:

"Mr. Pellettieri: * * * The purpose of our demand is to show the statute, rules and regulations relating to overtime payments were interpreted uniformly throughout the State service during the period of these charges. This interpretation did not prohibit overtime payments or extra compensation to employees above $240.00 annual increment and such payments were regular and prevailed throughout the State service.

We respectfully urge that this is important to a charge of malfeasance, misfeasance and misconduct because if the records bear us out they will show that every one understood the payments not to be prohibited and thus they will show that there was no operative prohibition; and thus acceptance of such payment by Mr. Russo, or anyone else, is not motivated by any evil intent or result of any conscious wrongdoing.

Governor Meyner: Mr. Fisher.

Mr. Fisher: Sir, the issue is whether Russo received his extra payments lawfully or unlawfully and knowingly. Good faith is a matter of his own reaction to certain circumstances. Mr. Russo

would be free to testify, if he wishes, what knowledge he has of other services, or other rules, or other regulations made. Any offer by Mr. Pellettieri to prove or to show that someone else had, perhaps, likewise unlawfully received any extra compensation would not be a justification, would not show any good faith on Mr. Russo's part. Mr. Russo's good faith would depend entirely upon his own action, and upon his own knowledge, and upon whether it came to his attention and how he reacted toward such facts. I do not see any relevancy with respect to material pertaining to others.

Mr. Pellettieri: That's just the point we made. How can we demonstrate Mr. Russo's claim of good faith if we are not permitted to show the facts demonstrated, at least demonstrating a reasonable basis for it in his behalf, extra payments were in order with general State policy. That's the basis of our objection.

Governor Meyner: What is this second motion specifically?

Mr. Pellettieri: That we want the list which we have submitted to your counsel for the production of the records of overtime payments to—we are informed there are at present 127 or 130 people on the State payroll who are beyond the $240 annual increment and are on overtime compensation. We want to show Mr. Russo knew of that by reason of the position he held. That's the element of good faith insofar as he was concerned knowing it was a State policy.

Governor Meyner: I think I have outlined in my letter to you May 6th, the conditions under which we are willing to assist you in issuance of subpoenas; and until you can meet the conditions set forth, I will deny your motion."

The Governor's final determination was that Russo should be removed from office. In reaching this conclusion, the Governor continued to adhere to the position taken in the preliminary determination of his own *prima facie* case. But on the issue of good faith the Governor appeared to be of an excusing mind with regard to any violation of the law while Russo held the positions of Director of Recruitment and Placement and Assistant Chief Examiner, which were positions of lesser rank than Chief Examiner and Secretary, because the testimony showed a prior record of overtime payments to the holders of these same positions and in this regard he said that he "would not order removal in such circumstances." However, with respect to the payments received by Russo while he was Chief Examiner and Secretary, the Governor, in addition to the illegality, held that Russo "acted in bad faith and without the circumspection which the public interest demands of persons in public office." He

obviously placed great importance upon the fact that Russo failed to take the stand and testify in his own behalf. The Governor said:

"The testimony leads me to conclude that Russo, well aware of the statutory ban and the fact that the payments he sought were without precedent, deliberately 'jockeyed' others into approval of those payments. His failure to testify buttresses the only inference which the given testimony will permit."

Yet in finding Russo's conduct sufficiently serious to require in the interests of the public the exercise of his removal power, the Governor declared:

"* ˜ * * I am concerned with the loss of pension rights which he [Russo] accumulated over many years. I understand that an additional brief period of service would entitle Russo to certain benefits payable at age 60. I will consider a memorandum from Russo with respect to whether I can lawfully take any appropriate step to preserve his pension benefits, upon condition, however, that there be repaid to the State all overtime compensation received as Chief Examiner and Secretary."

## II.

1. *Article* V, *Section* IV, *paragraph* 2, of the Constitution has not been before us for construction except on an earlier phase of this same controversy, *Russo v. Walsh,* 18 *N. J.* 205 (1955), *supra.* The situation is particularly troublesome because the Governor's opinion indicates that he would have reached in some respects a different conclusion, if he had been aware that he had the broad power that we find he has under a fair construction of this constitutional provision in light of the objectives intended to be attained under it, rather·than the technical, literal view that he adopted in deference to the language of the implementing statute, *N. J. S. A.* 52:14–17.2 *et seq.*

Our first inquiry is therefore as to the scope and the meaning of the constitutional provision here involved. Our constitutional history shows us that the authority granted to the Governor was but one of the steps on the long road

back from the post-Revolutionary reaction to the attitudes of colonial governors which led the framers of our earliest Constitution to look with suspicion upon the grant of any great power to the Governor. Even the Constitution of 1844, though it departs from the principle of legislative responsibility for the general administration of government, still failed, in common with most other state constitutions, to repose in the Governor sufficient executive authority to cope adequately with his increased responsibility, *Proceedings of the Constitutional Convention of* 1844, *p. ciii.* It took more than a century to develop and recognize the need

"to bring the powers of the governor into line with the popular impression of the powers of that office and to provide a centralization of authority and power in the office of governor under reasonable checks and balances, so that the chief executive may be truly responsible to the people for the conduct of the executive branch of the government." *Report of the Committee on Executive, Militia and Civil Officers,* 2 *Proceedings of the Constitutional Convention of* 1947, 1122;

see also *Report of Commission on Revision of New Jersey Constitution,* 1942, 8, 17; *Freedman, "The Governor—Constitutional Power of Investigation and Removal of Officers"* in 2 *Proceedings of the Constitutional Convention of* 1947, 1410–1412. The avowed purpose was to give to the Governor adequate supervision over public officers and employees consistent with the responsibility imposed on the Governor for the executive administration of government, on the one hand, and the doctrine of the separation of powers on the other.

The power to remove without permitting any intermediate degrees of penalty clearly would not be consistent with the concept of adequate supervision. Nor could it have been reasonably intended that the Governor should have the power to discharge an employee for some obvious but minor infraction of his duty. The purpose of the constitutional provision in question is obviously to give the Governor power commensurate with his responsibility. To grant him the power only to remove for cause and to withhold from him the power to administer lesser penalties in

appropriate instances is not only unrealistic, but it will also in most cases be ineffective to accomplish the fundamental purpose for the repose of the authority. That the right to impose all lesser degrees of punishment is inherent in the right to remove for cause is recognized by the majority of this court in *Russo v. Walsh,* 18 *N. J.* 205 (1955), *supra,* in dealing with the power of the Governor to suspend pending a hearing before him. The only conflict evident from the dissent in that case was that the constitutional power should not be construed so as to permit an effective removal by preliminary suspension prior to a due and proper hearing, *Id.,* 18 *N. J.,* at *pages* 213–218. In the grant of supervisory power to the Governor the underlying considerations were that he should not be made, on the one hand, the subject of control by an unfriendly Legislature, nor, on the other hand, should the public officers over whom the power was to be exercised be subject to the whims and prejudices of an ambitious executive, 5 *Proceedings of the Constitutional Convention of* 1947, 33, 98. Thus, a constitutional provision which spoke in terms of a maximum grant of power—the power to remove—attended with such safeguards as a public hearing and a right to judicial review which provided adequate protection to the individual officer or employee, answered all of the objections to the preexisting inadequacy of gubernatorial power and responsibility. The Governor, therefore, under the authority vested in him by *Article* V, *Section* IV, *paragraph* 5 of the Constitution, must be viewed as having the power not only to remove for cause after proper hearing but also to impose all intermediate or lesser degrees of punishment suitable to the proven misconduct.

2. Our next inquiry relates to the nature and extent of the review to be accorded the public officer or employee proceeded against under this provision of the Constitution. It is provided that "such officer or employee shall have the right of judicial review, on both the law and the facts, in such manner as shall be provided by law." Since the Governor is given the power to be the accuser, the prosecutor, the judge and the jury, it seems but natural that the review

in the judicial branch of government contemplated by the framers of the Constitution was intended to be an effective check on the exercise of the power for the protection of the public officer or employee; see *Report of the Committee on Executive, Militia and Civil Officers, 2 Proceedings of the Constitutional Convention of* 1947, *supra,* 1122. While this power was given to the Governor as part of the over-all attempt to strengthen his executive authority over those within his charge, it is obvious that the people likewise sought to provide for the broadest type of review "on both the law and the facts," not only to remove any possibility of misuse of the power to the detriment of the public officer or employee but, equally important, to also protect the Chief Executive from all suspicion that he was in any way using his power for any personal or political purpose; see 5 *Id.* 98. Nothing less than the standard of substantial justice will satisfy the necessities of the situation.

No matter what may be the particular phraseology that is continued to be employed by reason of historical developments in specific classes of cases of judicial review, the ideal of substantial justice is the underlying concept toward which all of our appellate proceedings tend. That ideal has been inherent in our rules for over a century, from Rule 33 of the Court of Errors and Appeals of 1846 to *R. R.* 1:27A, and its specific manifestations are equally familiar. Thus, even a jury finding is set aside, where it clearly and convincingly appears that the verdict was the product of bias, passion, prejudice or mistake, *R. R.* 1:5–1, 1:5–3. Where under *R. R.* 1:5–2 provision is made for the review upon appeal "both upon the law and the facts" of summary convictions for contempt, the appellate court must give such judgment as it deems "to be lawful and just under all the circumstances of the case." In workmen's compensation cases the hearing of appeals before the County Court is by trial *de novo,* broad in its scope and providing a new mind for a consideration of the testimony adduced, see *Folsom v. Magna Manufacturing Co.,* 14 *N. J. Super.* 363, 367, 368 (*App. Div.* 1951); *De Monaco v. Renton,* 32 *N. J. Super.* 450, 455 (*Cty Ct.* 1954), re-

versed on other grounds 18 *N. J.* 352 (1955). An appeal in equity is also a trial *de novo* on the record below and if it appears that a decree of the Chancellor was clearly inequitable and unjust it would not be enforced, *Terhune v. Colton,* 12 *N. J. Eq.* 312 (*E. & A.* 1857). The application of all of these specific rules merely add up to the doing of substantial justice. We have limited this principle only to the extent of saying that due deference must be paid to the opportunity of the trier of the facts to judge and pass upon the credibility of the witnesses, *R. R.* 1:5–3, 1:5–4; *Gagliano v. Botany Worsted Mills,* 13 *N. J. Super.* 1, 5 (*App. Div.* 1951). Even in the newest form of tribunal, the administrative agency, the earlier heresies and misunderstandings as to "substantial evidence" meaning "any evidence" that would make out a case have been done away with by the Federal Administrative Procedure Act, 5 *U. S. C. A.* § 1009, *Universal Camera Corp. v. National Labor Relations Bd.,* 340 *U. S.* 474, 71 *S. Ct.* 456, 95 *L. Ed.* 456 (1951). And while it has always been recognized, just as in the case of the trier of the facts, that due deference must be accorded to the expertise of the administrative official, the degree of deference to be accorded in a particular case must also depend on whether the issue truly involves expertise. Since cases involving the disciplining of a public officer or employee ordinarily involve no expertise, we are returned to the fundamental premise of substantial justice as the standard of judicial review.

█ 3. We are naturally led next to the inquiry as to whether provision for a review on the law and facts "in such manner as shall be provided by law" permits any limitations on the broad type of review intended. *N. J. S. A.* 52:14–17.2 provides that the appeal from the order of removal may be taken to the Appellate Division in the same manner as in a case of an appeal from a final decision of an administrative agency in lieu of prerogative writ. This procedure, in turn, is governed by *R. R.* 4:88. But seemingly the Legislature has gone further and by *N. J. S. A.* 52:14–17.10 has provided that the reviewing court may reverse or nullify the Governor's order of removal upon a

determination of a matter of law "or when it clearly appears that there was no evidence before the Governor reasonably to support the order of removal." If this section 17.10 is to be viewed as providing for the regulation of the remedy or limiting in any way the scope of the review contrary to the constitutional provision which it was designed to implement, it is clearly invalid. However, if there is a basis on which to sustain the enactment we must of necessity do so. The unconstitutionality of a statute which goes beyond the implementation of its parent provision creates such an obvious incongruity as not even to be considered as being within the intention of the Legislature in passing it. On the other hand, if we construe the "no evidence" provision of this statute as requiring the same quest for substantial justice that is called for by the constitutional provision, then the Constitution and the statute fit together to form the harmonious provision intended to strengthen the Governor's executive position and give protection to the public officers and employees over whom he exercises this great power. In our judgment the statute is not incongruous with the standard of substantial justice.

4. What is the law to be applied to the instant case? Very clearly the taking of these payments by Russo after becoming a line officer, almost comparable to cabinet rank, was illegal. There is little that can be added to the Governor's determination on this score. As Chief Examiner and Secretary, Russo's salary was to be "as provided in the annual appropriation law," (*R. S.* 11:2–1) and as such officer he could "hold no other public office or employment" except as an unpaid officer "or as director of any *quasi*-public or other corporation," (*R. S.* 11:2–2). The taking of payments for work performed for the Division of Employment Security either as overtime or as duties performed separate and apart from his official position brought him within the prohibition of either one or the other of these statutes, depending on the appellant's contention. Further, by "Regulations of the Legislative Committee on Overtime Concerning the Work

Week and Overtime Compensation for Positions in the State Service under *Chapter* 51, *P. L.* 1951," which provide:

"For such positions and classes of positions for which it is impracticable to establish a fixed work week schedule the Committee, in considering eligibility for overtime compensation, will establish and record the work week as indefinite. Any position or class of positions for which the work week is recorded as indefinite, for purposes of considering eligibility for overtime compensation, shall be considered as being excluded from the further application of *Chapter* 51, *P. L.* 1951, except that for such positions or classes of positions for which it can be demonstrated that the actual hours worked are regularly in excess of forty per week the Committee may make appropriate recommendations for adjustments other than provided under *Chapter* 51, *P. L.* 1951,"

and the resolution of such committee of July 18, 1951, which provides:

"It was unanimously adopted to establish as indefinite, for overtime compensation purposes, the work week of any position or class of positions allocated to ranges with applicable increments of $240, and over,"

Russo was plainly within the class of officers whose work week was classified as "indefinite" and for whom no overtime payments were permitted. He was in the increment range of "$240, and over." Russo, therefore, received money which he had no legal right to receive, and even though services actually performed furnish the basis for such payments, they cannot be retained. Good faith cannot right this wrong and save him from the legal consequences of a violation of the law, any more than it would save any one of us from an adverse verdict were we to commit a trespass in going upon another's land believing in good faith that we had a right to do so. The extra payments received while Russo was Chief Examiner and Secretary must therefore be returned by him. These illegal payments, moreover, constitute ground for discipline without proof of a guilty mind which the Governor seems to have thought essential ("The remaining issue is whether Russo's conduct was attended by a state of mind sufficient to warrant removal."). The proceeding here

under review is not a criminal one or criminal in nature, and proof of a guilty mind on questions of law at least is not required. The issue of Russo's good faith and the practice of other employees similarly situated is germane, however, on the extent of the discipline required in the public interest.

It has been argued that, having found ground for disciplining the appellant, our function ends. This manifestly cannot be so. We are directed by the Constitution, *Art.* V, *Sec.* IV, *par.* 5, to review the Governor's order "on both the law and the facts." In the process of reviewing the law we have determined that the Governor has more varied powers than he himself believed and also that proof of a guilty mind is not essential. Under the constitutional provision it is our duty to construe the pertinent constitutional and statutory provisions and to apply the law to the facts. We are not privileged, as has been suggested, to stop short of this any more than the Legislature would be justified under the constitutional provision in question in curtailing the Governor's power of removal or our right of review and our power to construe the law.

5. Russo above all other state officers or employees should have complied with the law. He was the chief administrator of the work of the Civil Service Commission and was obliged to enforce these regulations according to their letter and spirit as to all state employees. He was expressly required by *N. J. S. A.* 11:6–2(*e*) to "regulate * * * hours of work, attendance and payments for overtime in accordance with the provisions of the rules and regulations established under this subtitle." Therefore, the informal manner in which he undertook to resolve this matter of overtime in his own favor is not to be condoned. But any appraisal of his conduct must take into consideration the fact that these payments were made to him in other positions even as high in the scale as Assistant Chief Examiner, where admittedly there was precedent for such payments and for which even now any possible violation of the indefinite law on the subject was disregarded by the Governor. Even though the

statutes and the regulation relating to the limitation on
Russo's compensation in his position as Chief Examiner and
Secretary are clear to us, there is substantial evidence point-
ing to a belief in the minds of Mr. Molloy, counsel for the
Unemployment Compensation Commission, and Messrs.
Backes and Griggs, the deputy attorneys-general assigned to
advise the Civil Service Commission—the three officers within
the two departments involved upon whom Russo would
normally rely as to the operation of these laws—as to the
legal propriety of these additional payments. From the
testimony it may be reasonably inferred that Russo had been
advised that overtime could properly be paid to him in the
chief position. Certainly there was nothing surreptitious
about the payments. It was admitted that all the vouchers
were approved by the Civil Service Commission, the chief
fiscal and personnel officer and the Director of Unemploy-
ment Compensation Commission, and later the Division of
Employment Security. Dr. Lester H. Clee, President of
the Civil Service Commission, testified that Russo performed
service on Saturdays, nights and even Sundays, and that the
services were well worth $1,000 extra per year. In cross-
examining Dr. Clee the Governor attempted to establish that
in approving of the payments Dr. Clee relied solely upon
Russo's representation that they were legally proper. Dr.
Clee's replies, however, indicate not only an attitude of
good faith on Russo's part but also show that in approving
these charges Dr. Clee was guided by "the history of the
whole case of this program for years and years" which he
did not believe, erroneously to be sure, was contrary to the
statutes. Then on cross-examination by Mr. Fisher, counsel
for the Governor, Dr. Clee testified as follows:

"Q. Now, Dr. Clee, regardless of any law, particularly as his
Excellency has pointed out to you 11:2–1, 11:2–2 and the Overtime
Act of 1951, irrespective of those laws, did you believe you had
authority as President of the Civil Service Commission to authorize
these payments to Mr. Russo for this overtime work as Chief
Examiner and Secretary?
A. I felt that I had the authority, sir, and if I hadn't felt so,
or thought it was anything that should not be done, I would have

been the first to make inquiry. I accepted it as what had been done, even though it wasn't a Chief Examiner. That never came into my thinking. I felt the job had to be done, he had been doing it and that was it."

Russo's experience with Dr. Charles P. Messick, for 32 years Chief Examiner and Secretary of the Civil Service Commission, was similar to his experience with Messrs. Molloy, Backes, Griggs and Dr. Clee. Dr. Messick testified that although he never received overtime compensation himself while Chief Examiner and Secretary that was due to objections from the Federal Government, but he had received an opinion from Mr. Molloy and Mr. Backes holding that it was legally proper under the law of New Jersey.

We are convinced that although Russo was wrong as a matter of law in taking extra payments, while Chief Examiner and Secretary, there are many facts that tended to disprove the charge of bad faith and fraudulent or corrupt behavior.

 The Governor was apparently confirmed in his view of Russo's bad faith by his failure to take the stand in his own defense. Ordinarily an innocent public officer or employee would be expected to do so. But in this case the Governor had declined to permit Russo to inspect the records of other departments to ascertain the exact facts as to similar overtime payments in these other departments to prepare himself for the Governor's cross-examination. While Russo, from his work as Chief Examiner and Secretary, may have known these facts generally, he was clearly entitled by the same kind of discovery processes as would be available in an ordinary civil trial to prepare himself for cross-examination. Russo's failure to take the stand in his own behalf was on the advice of his counsel, who feared that without such information available to his client in advance of trial from the public records not only would Russo's cross-examination by the Governor's counsel, who had all the records available to him, be unfair but that Russo also by lapse of memory might misstate the names of any fellow employees and so subject himself to civil or criminal liability. To

the extent that the Governor based his conclusions with respect to the charges of bad faith on Russo's refusal to take the stand in the circumstances of a trial, which was inevitably highly publicized, we cannot but conclude that he was indeed prejudiced by the refusal of the Governor to grant him appropriate inspections in *subpoenas duces tecum*. The Governor might have met this objection by introducing evidence available to him in the public records to show that no other officer or employee of a class similar to Russo's had ever accepted overtime pay. If he had introduced such evidence, it would have gone far to negative Russo's contention of good faith. As the proofs now stand, however, they are patently incomplete on the issue of good faith and in these circumstances we are not in a position to adjudicate the issue until such proof is supplied. Nothing, however, which we have said in anywise derogates from the soundness of the Governor's conclusion as to the illegality of the acceptance by Russo of the payments made to him while Chief Examiner and Secretary being a basis for discipline as well as his obligation to repay the funds in dispute to the State.

It is not the function of this court to review the adequacy of the punishment imposed by the Governor. Manifestly, however, the Governor could not have believed that there was an absolute lack of good faith here as to demand the removal of Russo from his present position as Assistant Chief Examiner for these acts done while he was Chief Examiner and Secretary, or he would not have expressed his desire to preserve, if possible, the pension rights built up by Russo over the more than 20 years of service with the State. Apparently guided by a literal interpretation of the constitutional provision and *N. J. S. A.* 52:14–17.2, the Governor believed that cause for discipline had been established and removal of Russo was the only course open to him. In view of our construction of the power granted to the Governor under *Article V, Section IV, paragraph 5* of our Constitution, justice requires that the matter be remanded to the Governor for reconsideration in light of what was been said herein. If removal is the punishment that the Gov-

ernor desired to impose, no harm has been done to either party; but, if removal is the punishment that the Governor felt obligated to impose by virtue of his construction of the Constitution, then injustice has been done to both the appellant and the Governor.

The suggestion has been made that there is little authority for the court acting in this matter and that it is alien to the basic doctrine of the separation of powers. The doctrine of the separation of powers is nowhere construed as creating three separate, distinct and mutually exclusive departments of government, for to do so would not only make government unworkable, but it would prevent the operation of the necessary checks and balances which have made the doctrine of the separation of powers what it is today. Familiar examples are the Governor's powers in the field of legislation and the Senate's power in the confirmation of appointments. The general language of *Article* III with reference to the distribution of the powers of government "among three distinct branches, the legislative, executive, and judicial" must yield to the particular and specific language of *Article* V, *Section* IV, *paragraph* 5 of the Constitution authorizing the Governor to conduct a trial (ordinarily a judicial function) and the courts to review the Governor's order on both the law and the facts. We must give effect to the Constitution as we find it, at the same time reaffirming the doctrine of *Massett Public Building Co. v. Bennett,* 4 *N. J.* 53 (1950), which deals with the several historical exceptions in this State and elsewhere to the analytical concept of the doctrine of the separation of powers, cf. *Richman v. Neuberger,* 22 *N. J.* 28 (June 13, 1956) and *Richman v. Ligham,* 22 *N. J.* 40 (June 13, 1956).

In view of our construction of the power granted to the Governor under *Article* V, *Section* IV, *paragraph* 5 of our Constitution, and our application thereof to the facts of this case, the order of removal appealed from will under the authority of *Article* V, *Section* IV, *paragraph* 5 of the Constitution of 1947, be remanded for further proceedings in accordance with this opinion.

HEHER, J. (dissenting). The judgment formulated by my brethren proceeds on the hypothesis that, while the appellant Russo's "taking of payments for work performed for the Division of Employment Security either as overtime or as duties performed separate and apart from his official position brought him within the prohibition of either one or the other" of the cited statutes, *R. S.* 11:2–1; *R. S.* 11:2–2, and was "Very clearly * * * illegal," and "Good faith cannot right this wrong and save him from the legal consequences of a violation of the law any more than it would save any one of us from an adverse verdict were we to commit a trespass in going upon another's land believing in good faith that we had a right to do so," and the "extra payments received while Russo was Chief Examiner and Secretary must therefore be returned by him," yet the order of removal is remanded "for further proceedings in accordance with" the opinion. This, on the assumption that the Governor "could not have believed that there was an absolute lack of good faith here as to demand" removal from office, indicated, it is said, by his expressed desire to preserve Russo's pension rights, if possible, "apparently" restrained by the seeming belief, founded in a "literal interpretation" of the constitutional grant of power and the implementing statute, *N. J. S. A.* 52:14–17.2, that "cause for discipline" having been established, the "removal of Russo was the only course open to him."

But the opinion also declares the Court is "convinced that although Russo was wrong as a matter of law in taking extra payments, while Chief Examiner and Secretary, there are many facts that tended to disprove the charge of bad faith and fraudulent or corrupt behavior," and then holds that in the Governor's refusal of inspection of the "records of other departments to ascertain the exact facts as to similar overtime payments in these other departments to prepare himself for the Governor's cross-examination," Russo was denied the "discovery" to which he was "clearly entitled," such "as would be available in an ordinary civil trial to prepare himself for cross-examination," and "To the extent

that the Governor based his conclusions with respect to the charges of bad faith on Russo's refusal to take the stand in the circumstances of a trial, which was inevitably highly publicized, we cannot but conclude that he was indeed prejudiced by the refusal of the Governor to grant him appropriate inspections in *subpoenas duces tecum,*" and "As the proofs now stand," "they are patently incomplete on the issue of good faith and in these circumstances we are not in a position to adjudicate the issue until such proof is supplied," yet nothing thus said "in anywise derogates from the soundness of the Governor's conclusion as to the illegality of the acceptance by Russo of the payments made to him while Chief Examiner and Secretary being a basis for discipline as well as his obligation to repay the funds in dispute to the State."

But the issue is in essence one of constitutional power. Did the Governor exceed his constitutional prerogative to "remove" the officer "for cause"? If there was "cause" for the removal, there is no ground for judicial interference. The Governor concluded, in clear and explicit terms, that Russo, "well aware of the statutory ban and the fact that the payments he sought were without precedent, deliberately 'jockeyed' others into approval of those payments," and "His failure to testify buttresses the only inference which the given testimony will permit." There can be no question, none whatever, of the soundness of this determination of the ultimate issuable fact. Indeed, the majority finds that the taking of the payments was "Very clearly illegal," and "Good faith cannot right this wrong and save" Russo "from the legal consequences of a violation of the law * * *," yet it is said, as I read the opinion and the judgment, that "good faith" is the determinant of the right to remove, but the "illegal payments" constitute "ground for discipline without proof of a guilty mind."

I cannot accept this constitutional interpretation.

"Cause" for removal within the intendment of the constitutional grant to the Governor, *Article* V, *Section* IV, *paragraph* 5, does not mean fraud or bad faith to the

exclusion of all else; it signifies "just" cause, encompassing also incapacity, unfitness, neglect of duty, and official incompetence and irresponsibility justifying removal in the essential public interest, or some lesser measure of discipline which, in the view of the Governor, would be suitable in the particular circumstances. And, unless the action taken be so disproportionate to the nature of the transgression or misbehavior as to be plainly arbitrary and capricious, and thus an abuse of power, the judgment of the Governor as to discipline is not subject to judicial superintendence. There must be just cause for discipline as an element of the constitutional power to remove; but where there is such cause the measure of discipline, including removal from office in the public interest, is the province of the Governor alone.

The "judicial review" on the "law and the facts" secured by the Constitution does not comprehend the substitution of the judicial judgment as to the nature of the discipline to be visited upon the offending officer for the discretion and judgment of the Governor, there being just cause for the course taken. The one is the judicial province; the other is the exclusive function of the executive, barring arbitrary action constituting a perversion of the constitutional power. These considerations would seem to be basic to the constitutional scheme, just as the judicial review of convictions in criminal or *quasi*-criminal proceedings would not include the substitution of different punitive and penal measures than those ordained by the Legislature. There is a delicate balance to be maintained between these coordinate branches of the State Government, an imperative judicial duty if the Constitution is to remain the fundamental law of the State. The Constitution vests the power of removal in the Governor, not in the judiciary.

Here, there was a knowing and intentional violation, for personal gain, of the law establishing appellant's salary as a "line" officer, by a maneuver designed to accomplish indirectly what he knew could not be had directly, and thus an abdication of official responsibility. Of this there can be no doubt. And is not this palpable evasion conclusive

of a "guilty mind"? My brethren say, and I concur, that "Russo above all other state officers or employees should have complied with the law"; he was the "chief administrator of the work of the Civil Service Commission and was obliged to enforce these regulations according to their letter and spirit as to all state employees"; and he was "expressly required by *N. J. S. A.* 11:6–2(*e*) to 'regulate * * * hours of work, attendance and payments of overtime in accordance with the provisions of the rules and regulations established under this subtitle.'" And it is to be added that he arranged for the payment of the additional compensation by a division of government under his supervision in the administration of civil service, and thus revealed a significant insensitivity to the responsibilities of his own high civil service office, an obligation of singleness of purpose always and the avoidance of incompatible relationships and interests plainly at variance with basic public policy obvious to all, a standard of official conduct and action that he was obliged to exemplify and in substantial measure to enforce in other civil servants. As noted in the opinion, the additional compensation was certified for payment by the Director of the Unemployment Compensation Commission, and later by the Division of Employment Security, a department under civil service supervision.

In a note citing cases in 24 *Ann. Cas.* 147, it is said: "It is generally held that exacting illegal fees or compensation is misconduct for which a public officer may be removed from office." And in *People ex rel. Johnson v. Coffey,* 237 *Mich.* 591, 213 *N. W.* 460, 52 *A. L. R.* 1 (*Sup. Ct.* 1927), this is affirmed: "The courts, too, frown on the taking of moneys from the public treasury unlawfully, in the guise of salary, fees or compensation, and deal more severely with such official misconduct than with many other acts of official misbehavior, different in kind." There, the Michigan Supreme Court sustained the Governor's removal of the state superintendent of public instruction for a similar dereliction. See also *Evans v. Inhabitants of City of Trenton,* 24 *N. J. L.* 764 (*E. & A.* 1853).

And nonfeasance may be a good ground for removal or suspension. The grant of an office at common law was upon the implied condition that the incumbent would "faithfully execute it," and for neglect of this duty the grantor could discharge him. *People ex rel. Bishop v. Kingston & M. Turnpike Road Co., 23 Wend. (N. Y.)* 193 (*Sup. Ct. Jud.* 1840). "For cause" means for reasons which are plainly sufficient under the law and sound public policy, such as give fair ground for removal and are not frivolous. See *Haight v. Love,* 39 *N. J. L.* 14, 22 (*Sup. Ct.* 1876); *Mayor and Council of City of Hoboken v. Gear,* 27 *N. J. L.* 265 (*Sup. Ct.* 1859); *Throop, Public Officers* (1892), *section* 366.

The Governor found that Russo acted in conscious disregard of his statutory right, "in bad faith and without the circumspection which the public interest demands of persons in public office"; and the proofs sustain the finding. In this context, further inquiry as to "good faith" has no place. As said, there was a knowing, intentional violation of the law; and this was cause enough for removal, if the Governor deemed that course to be for the public good. Russo did not take the witness stand to reveal the subjective motivations for his action; and he must abide the adverse inferences reasonably deducible from his omission so to do. And in this course, he is not excused by the failure of "discovery." Other violations of the law could not excuse his own; at all events, he could only rely upon violations within his own knowledge at the time of his own action, and he did not need discovery to make these known. Moreover, it was shown that no such payments had ever been made to a predecessor in his office. There was no precedent for such action. Dr. William S. Carpenter made it known during the course of his administration as president of the Civil Service Commission that the Chief Examiner and Secretary, as a "line" officer, could not have payment for "overtime service." Governor Meyner's action in this regard is unassailable.

I concur in the holding that discipline short of removal is within the Governor's constitutional province. But I

would suggest that this affords no ground for remanding the proceeding to the Governor for further action in the light of this interpretation. If the Governor is minded to modify the judgment of removal, he may do so even though there be an affirmance. I do not read the Governor's remarks as indicating that he would have been less severe in the course taken had he been aware of the power so to do, or that he was in doubt as to the range of his discretion. He said merely that he was "concerned with the loss of pension rights which he (Russo) accumulated over many years," and he understood that "an additional brief period of service would entitle Russo to certain benefits payable at age 60," and he would "consider a memorandum from Russo" as to whether he could "lawfully take any appropriate step to preserve his pension benefits, upon condition, however, that there be repaid to the State all overtime compensation received as Chief Examiner and Secretary." The proposal was not accepted, nor was the compensation returned.

I would affirm the judgment as rendered.

WACHENFELD, J. (dissenting). The crucial factual determination made by the Governor, that the appellant illegally received compensation for services allegedly performed by him, is fully sustained by the majority. The opinion concludes that "there is little that can be added to the Governor's determination on this score" and Russo's "good faith cannot right this wrong and save him from the legal consequences of a violation of the law." I am in accord in both instances.

With these pronouncements, however, my concept is that our power to affect the result reached below is exhausted, no matter how broad may be the scope of judicial review under the removal clause of the Constitution. Under *Art.* V, *Sec.* IV, *par.* 5, of the Constitution, the question of punishment in these matters is expressly reserved for the Governor's discretion and not for the reviewing tribunals.

I agree with the majority that it is not for this court to sit in judgment upon "the adequacy of the punishment im-

posed by the Governor" in the exercise of his powers under the removal clause of the Constitution. Nor is it the function of this court to review the severity of the punishment meted out by the Governor.

Even where we have traditionally exercised the power of review upon the law and the facts, as in appeals in criminal causes, we do not possess nor have we ever to my knowledge exercised the power to review the adequacy or the severity of a sentence imposed by the court of first instance. The sentence itself presents no question of law; it is a matter solely within the discretion of the sentencing judge.

Yet the majority, in substance, remands the cause to the Governor with what is the equivalent of a suggestion that he may reduce the "sentence" which he has already determined. There is little authority for our intrusion into a purely executive function. Indeed, it is alien to the basic doctrine of the separation of powers not only expressly decreed by our Constitution but fundamental to our concept of democratic government.

The justification for the remand procedure is the Governor's supposed failure to appreciate his constitutional power to impose a punishment less than removal if he so desired.

From a reading of the record, I come to a contrary conclusion as to the Governor's appraisal in this respect. It seems quite clear from the Governor's written opinion that he was fully aware of the fact that he could prescribe a punishment less than removal. After concluding the payments to Russo were illegal, he expressly stated that "the remaining issue is whether Russo's conduct was attended by a state of mind sufficient to warrant removal." The basis on which this statement was made connotes a recognition of the power to mete out a lesser punishment if the evidence so warranted.

The Governor's humane concern for the appellant's loss of his pension rights, which prompted him to seek steps to preserve them, contradicts any notion that he placed a narrow construction upon his authority under the Constitution.

It shows, additionally, grave concern about the penalty and considerable reluctance to impose it. Many a judge has encountered the same equation, regretting the severity of the punishment but imposing it nevertheless, deeming it to be required in the public good.

The order of removal which the Governor signed recites:

"Upon the findings of fact and conclusions of law therein set forth, I find and conclude that the respondent, Louis J. Russo, should be removed from his office or position of Assistant Chief Examiner in the Department of Civil Service for cause, as detailed in the said Final Determination."

The order, in my view, is factually and legally correct and should be affirmed *in toto*.

*For reversal and remandment*—Chief Justice VANDERBILT, and Justices OLIPHANT, JACOBS and BRENNAN—4.

*For affirmance*—Justices HEHER and WACHENFELD—2.