ARTHUR F. NAYLOR, ET ALS., PLAINTIFFS-RESPOND-ENTS, v. THOMAS J. HARKINS AND THE GRAND INTERNATIONAL DIVISION OF THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS, AN UNINCORPORATED ASSOCIATION, ET AL., DEFENDANTS-APPELLANTS.

Argued January 12, 1953—Decided February 16, 1953.

436

*Miss Ruth Weyand* of the Illinois Bar, argued the cause for the appellants (*Mr. Howard G. Kulp, Jr.*, attorney).

*Mr. James M. Davis, Jr.*, argued the cause for the respondents.

The opinion of the court was delivered by

JACOBS, J. This is an appeal under *Rule* 4:2–2(*a*) (1), certified by this court on its own motion, from a preliminary injunction entered in the Chancery Division.

The plaintiff Naylor was a member and officer of Division 851 of the Grand International Division of the Brotherhood of Locomotive Engineers and in January 1950 was elected chairman of the local committee of adjustment for a term of three years. The numerous other plaintiffs are firemen and engineers in the employ of the Pennsylvania Railroad and were members of Division 851. For many years claims for extra pay were being asserted by firemen, trainmen and engineers against the railroad for service in operating its trains on tracks of foreign railroads on the Delaware River waterfront. In 1948 settlements of these claims were made between the railroad and the brotherhoods of firemen and trainmen, and a settlement was offered to the Brotherhood of Locomotive Engineers. On April 23, 1951 Division 851 voted to accept the settlement but thereafter Naylor announced that he would not approve the settlement; he asserted such authority under resolution, division 22, which

states that "no agreement shall be made without the approval in writing from the Local Chairman or Local Chairmen of the seniority district or seniority districts."

On May 3, 1951 Naylor instituted an action in the United States District Court for the District of New Jersey seeking to enjoin the railroad from proceeding with the proposed settlement without his approval; he asserts that he took this action under the authority of Standing Rule 48(c) of the brotherhood which provides that every member grants to the duly authorized representatives, which include local chairmen and others, power to handle his claims against the railroad and that such power shall include authority to submit his claims "for determination to any person, court, or board or other tribunal provided by law or otherwise as may be deemed necessary or advisable by such authorized representatives." Thereafter a member of Division 851 filed charges within the division against Naylor, alleging that he had violated certain statutes of the brotherhood, including section 93 which provides that any member who, without exhausting his remedies within the brotherhood, submits to the civil courts "any case in controversy arising within the Organization, and for which the laws of the Brotherhood provide a means of settlement" shall be deemed guilty of disloyalty and upon conviction shall be expelled. Pursuant to these charges Naylor was temporarily removed from office, but the prescribed procedure had admittedly not been followed and J. P. Shields, the grand chief engineer of the brotherhood set the proceedings aside. The defendants assert that Shields' authority in this regard rests upon section 6(c) of the brotherhood's constitution which permits him to review "the records of any trial conducted in a Division when same is brought to his attention by any Division or member."

On May 28, 1951 new charges, based on the institution of his action in the United States District Court, were filed against Naylor. An investigating committee reported that there was evidence to substantiate the charge under section 93 but Naylor stated that he "was pleading not guilty and

offering evidence to support his position" and the division by a vote of 44 to 9 rejected the report. The plaintiffs assert that there was no actual trial and that the rejection of the committee's report effectively terminated the matter; they rely upon section 73(*b*) of the brotherhood's statutes which provides that "If the Committee reports sufficient reasons for proceeding with trial and same is rejected by the Division, that shall end the proceedings unless charges are renewed." Nevertheless, a report on the matter was sent to Shields who, by letter dated July 5, 1951, set aside the Division's action and directed that it find Naylor guilty of disloyalty under section 93 and expel him from the brotherhood. In the same letter Shields advised that if the division did not comply with his instructions its charter would be suspended. At a meeting of the division, Shields' letter was rejected. Under date of August 8, 1951 Shields again wrote to the division repeating the directions in his letter of July 5, 1951 which he requested be "read in open meeting." His letter was not read at the next meeting of the division, and by letters dated August 14, 1951 Shields removed Naylor from his office as local chairman and expelled him from membership for violation of section 93, and revoked the charter of Division 851 on the stated ground, under section 6(e) of the brotherhood's constitution, that it had "become so demoralized as to constitute and be a detriment to the Brotherhood." The plaintiffs assert that this action was taken maliciously, illegally and without jurisdiction.

In his letter of August 14, 1951 to the division, Shields stated that "Loyal former members of Division 851 are to be transferred to Division 109." On February 14, 1952 a charter was issued to a new division known as 763 and those members of 851 who actually applied for membership in this new division were admitted. On April 28, 1952 the brotherhood entered into a union shop agreement with the railroad which stipulated that all engineers shall become members of the brotherhood and shall maintain such membership; this stipulation is, however, not applicable when mem-

bership is denied or terminated for any reason other than non-payment of dues, fees or assessments. Most of the plaintiffs never became members of Division 109 or Division 763 and, on the contrary, all the plaintiffs still claim to be members of Division 851 and hold regular monthly meetings. In their amended and supplemental complaint in the Chancery Division they seek restoration of the charter of Division 851, and damages, and Naylor seeks nullification of his ouster as member and officer of Division 851, and damages. A motion to dismiss the complaint was denied and the defendants filed their answer. Thereafter the plaintiffs applied for a preliminary injunction claiming that, in view of the brotherhood's union shop agreement with the railroad, their employment was endangered if they did not disavow Division 851 and join a rival division, thereby destroying or impairing the subject matter of their action. On July 3, 1952 Judge Haneman entered an order that, pending trial, the defendant brotherhood be enjoined from reporting to the railroad under the union shop agreement that the plaintiffs are not members of the brotherhood. This order was conditioned upon the plaintiffs' payment into court of the amount of dues payable to the Grand International Division of the Brotherhood of Locomotive Engineers and the General Committee of Adjustment for the Pennsylvania Lines-East. The brotherhood duly appealed and in support advances the following contentions: (1) The Railway Labor Act deprived the Chancery Division of jurisdiction to enter the order; (2) the plaintiffs failed to exhaust their remedies within the brotherhood and were therefore barred from judicial remedy, and (3) the plaintiffs' showing of irreparable injury and probable success was insufficient and on a balance of equities should not have been granted the preliminary injunctive relief.

I.

The Railway Labor Act confers upon the National Railroad Adjustment Board comprehensive jurisdiction over

disputes between employees and carriers growing out of grievances or the interpretation or application of agreements concerning rates of pay, rules, or working conditions. See 45 *U. S. C. A.*, § 153(*i*). This administrative forum has been afforded with the view of settling such railroad disputes before they reach critical stages which may bring on crippling strikes. *Slocum v. Delaware L. & W. R. Co.,* 339 *U. S.* 239, 242, 70 *S. Ct.* 577, 94 *L. Ed.* 795, 799 (1950). In general, its jurisdiction to adjust such disputes is exclusive. See *Slocum v. Delaware L. & W. R. Co., supra; Piscitelli v. Penna.-Reading Seashore Lines,* 11 *N. J. Super.* 46 (*App. Div.* 1950); *Marchitto v. Central R. Co. of N. J.,* 18 *N. J. Super.* 163 (*App. Div.* 1952), certif. denied 9 *N. J.* 403 (1952). But *cf. Moore v. Illinois Central R. Co.,* 312 *U. S.* 630, 61 *S. Ct.* 754, 85 *L. Ed.* 1089 (1941); *Brotherhood of Railroad Trainmen v. Howard,* 343 *U. S.* 768, 774, 72 *S. Ct.* 1022, 96 *L. Ed.* 1283, 1289 (1952). Where, however, the disputes are not of the type described, they are not affected by the provisions of the act and remain within the traditional jurisdiction of the courts. See *Marchitto v. Central R. Co. of N. J.,* 9 *N. J.* 456, 463 (1952).

The dispute in the instant matter is not of the type contemplated by the act. There is no controversy whatever between the plaintiffs and the railroad carrier, nor is there any controversy which grows out of any grievance against the carrier or the interpretation or application of any collective bargaining agreement with the carrier. The dispute is wholly an internal one between brotherhood members or former members on the one hand and the brotherhood and its officers on the other. Nothing in the Railway Labor Act withdraws from the Chancery Division power to hear and determine that dispute and ultimately adjudge, if the facts and controlling legal principles so warrant, that Division 851 and the plaintiffs are in good standing as a division and as individual members of the brotherhood. See *Marchitto v. Central R. Co. of N. J., supra,* at *p.* 465. Having jurisdiction of the basic controversy between the parties, the Chancery Division

had ample power to preserve the subject matter and direct that the parties maintain the *status quo* and refrain from affirmative action which would impair it. See *Christiansen v. Local 680 of the Milk Drivers, &c.,* 127 *N. J. Eq.* 215 (*E. & A.* 1940). Such power is essential to subserve the ends of justice, and its exercise by the Chancery Division in the order under appeal in no wise ran counter to the letter or purpose of the Railway Labor Act. The order simply directed that, pending trial, the brotherhood withhold sending any notice to the carrier stating that the plaintiffs were no longer members of the brotherhood; we fail to see how it may possibly be said to concern a dispute between the plaintiffs and the carrier or endanger the carrier's uninterrupted railroad activities. See *Fulda, Labor Law,* 7 *Rutgers L. Rev.* 133, 142 (1952). The defendants' contention that the Railway Labor Act deprived the Chancery Division of jurisdiction to enter the order lacks merit and was properly rejected below.

## II.

The defendants contend that the plaintiffs should have exhausted their remedies within the brotherhood and having failed to do so are not entitled to judicial relief. *Dragwa v. Federal Labor Union No.* 23070, 136 *N. J. Eq.* 172, 178 (*Ch.* 1945); *Siena v. Grand Lodge, etc., Order Sons of Italy,* 11 *N. J. Super.* 507, 517 (*App. Div.* 1951). They point out that the plaintiffs had the right, under the brotherhood's constitution, to appeal the action of Shields at its next convention which is scheduled to take place in June 1953. Shields' letters revoking the charter and ousting Naylor were written in August 1951, and under their terms they took effect immediately without opportunity for any stay within the brotherhood. The next convention was almost two years away and would presumably be held in Cleveland, Ohio. The plaintiffs could hardly have been expected to permit that period of time to elapse without taking any interim action

whatever for their own protection, thus depriving themselves of union representation and endangering their very employment.

It is well recognized that members of a union will ordinarily be required to avail themselves of the internal remedies provided by its constitution and rules before resorting to the courts for relief. See *Dragwa v. Federal Labor Union No.* 23070, *supra.* But it is equally well recognized that where those remedies are futile, illusory or vain, elemental considerations of justice will dictate that the courts reject their invocation as a barrier to judicial relief against arbitrary or illegal action. See *Walsche v. Sherlock,* 110 *N. J. Eq.* 223, 228 *(Ch.* 1932); *Harris v. Geier,* 112 *N. J. Eq.* 99, 107 *(Ch.* 1932); *Local No.* 373, *etc., v. International, &c., Ironworkers,* 120 *N. J. Eq.* 220, 230 *(E. & A.* 1936); *Washington Local Lodge v. International Brotherhood,* 33 *Wash. 2d* 1, 203 *P. 2d* 1019, 1046 *(Sup. Ct.* 1949); 168 *A. L. R.* 1462, 1473 (1947). In the *Walsche* case Vice-Chancellor Berry collected decisions holding that the availability of an appeal at a general convention to be held in a distant city one, two or three years thereafter was insufficient to preclude immediate judicial relief. See *Reilly v. Hogan,* 32 *N. Y. S. 2d* 864, 870 *(Sup. Ct.* 1942), affirmed 264 *App. Div.* 855, 36 *N. Y. S. 2d* 423 (1942); *Reichert v. United Brotherhood &c. America,* 14 *N. J. Misc.* 106, 119 *(Ch.* 1936). See also *Summers, Legal Limitations on Union Discipline,* 64 *Harv. L. Rev.* 1049, 1086 (1951), where Professor Summers recently expressed his views on the pertinent authorities as follows:

"The courts have uniformly recognized that if exhaustion of union appeals would create too great a delay, the disciplined member can have immediate access to the courts. Thus, if the appeal is to the international convention which is not scheduled to meet for two years, or if the convention is supposed to meet on call but there is no real prospect of such a call, the courts will give immediate legal relief. Similarly, if the executive board fails or refuses to give prompt consideration to the appeal, the member need not wait indefinitely for an answer, but may, after a reasonable time, bring suit in the courts.

However, there has been little agreement as to what constitutes an unreasonable delay. In one court a delay of two and one-half months has been found excessive, but in another court a delay of more than a year was not. While a slight tendency has been 'shown to measure the reasonableness of the delay by the hardship involved, most courts have seemed unaware of the individual's plight during the appeal period and have generally applied this exception only where the delay was a year or more."

National and international unions have been recognized as important forces for public good and have been afforded extensive powers with concomitant responsibilities. If they are to function efficiently they must have reasonable power to discipline their divisions and individual members, and courts have displayed wholesome reluctance to interfere with such internal quarrels, recognizing that they are ordinarily best dealt with in union tribunals. But in the light of modern day realities the interests of the members and divisions must be recognized as too vital for impairment without accompanying compliance with the basic requirements of fair play and due process. See *Note, Procedural "Due Process" in Union Disciplinary Proceedings, 57 Yale L. J.* 1302 (1948). The notion that members and their division, summarily ousted by an official of the international, must await review of the legality of their ouster at a convention to be held almost two years thereafter in a distant city and be barred in the interim from seeking judicial relief in any form, simply shocks our sense of justice and we have no hesitancy in rejecting it. The corrective remedy is apparent and lies entirely within the hands of the unions; they may and ought set up and fairly administer simple and expeditious internal appeals and thus obviate the need for preliminary judicial intervention and the criticism that union appeal machinery is too often too slow and complex. See *Taft, Democracy in Trade Unions, 36 Am. Econ. Rev. Supp.* 359, 383 (1946); *Chamberlain, The Judicial Process in Labor Unions, 10 Brooklyn L. Rev.* 145, 162 (1940).

## III.

The defendants contend that the plaintiffs will suffer no irreparable injury by the denial of preliminary relief since they may apply for membership in Division 763 and thereby protect their employment. That division was set up during the pendency of the present litigation and may be described as a rival division consisting of former members of Division 851, loyal to Shields. The plaintiffs urge that Division 851 is, in legal contemplation, still in existence and that their joinder of the rival division would constitute a surrender of the status and the rights incidental thereto which they are seeking to establish and maintain. We perceive no basis in reason or authority for compelling the plaintiffs to make application for membership in the rival division as the means of preserving their employment pending trial. Furthermore, the plaintiffs properly place reliance upon the Chancery Division's order dated April 18, 1952 and not under attack, which denied an application to restrain the creation of Division 763 "upon the terms that the defendants shall not assert in this cause that the existence of a newly chartered division of the Brotherhood of Locomotive Engineers for the Philadelphia Terminal Division of the Pennsylvania Railroad Company in any way prejudices the relief sought by the plaintiffs, or any of them, in the amended and supplemental complaint."

Finally, the defendants contend that the plaintiffs made no showing of probable success and that on a balance of equities the preliminary relief should not have been granted. We find this contention to be without merit. The plaintiffs have reasonably and in good faith sought to attack the legality of Shields' action. Pending trial, they were justly entitled to have the defendants restrained from taking affirmative action which might destroy their status and the subject of the litigation, and this was so notwithstanding the doubts expressed that they will ultimately prevail. See *Christiansen v. Local* 680 *of the Milk Drivers, &c., supra,* at

*p.* 219; *Haines v. Burlington County Bridge Commission,* 1
*N. J. Super.* 163, 174 (*App. Div.* 1949). The restraint did
no more than to prohibit the defendants from notifying the
railroad, pending judicial determination of the issue, that
the plaintiffs were not members of the brotherhood; it could
hardly do any significant harm to the defendants. On the
other hand, if it had not been entered the employment of
the plaintiffs might well have been quickly imperiled by such
notification. It seems to us that, even on the balance of
equities suggested by the defendants, (*cf. Mullins v. Mer-
chandise, etc., Union No.* 641, 120 *N. J. Eq.* 376, 386 (*Ch.*
1936)), the plaintiffs, who have continued to pay union dues
in compliance with the condition of the injunctive order,
should have fair opportunity, without any overhanging threat
of imminent loss of employment for non-union membership,
to establish at full trial their position that Shields' action
was illegal and of no effect.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices
HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and
BRENNAN—7.

*For reversal*—None.