**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1199-22

AUDREY KERNAN,

    Plaintiff-Appellant,

v.

STATE OF NEW JERSEY,
NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT, ROBERT
ASARO-ANGELO, AND
PHILLIP D. MURPHY,

    Defendants-Respondents.

_____

Argued October 8, 2024 – Decided December 10, 2024

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1542-22.

Pasquale Guglietta argued the cause for appellant (Rosenberg Perry & Associates, LLC, attorneys; Pasquale Guglietta, on the briefs).

Ryne Spengler, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Kevin K.O. Sangster, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Audrey Kernan appeals her removal as a Workers' Compensation Judge by Governor Phillip D. Murphy. We affirm.

Judge Kernan was the subject of a complaint filed with the Office of Diversity and Compliance (ODC). The ODC investigated "allegations against [Judge Kernan], . . . for discrimination and harassment on the basis of race, sex/gender, and religion" and determined "the investigation substantiated a violation of the State Policy . . . and noted concerns of unprofessional conduct for some of the other allegations."

Thereafter, the Assistant Commissioner of the Department of Labor and Workforce Development (DLWD) filed a verified complaint with the Commission on Judicial Performance (CJP). The Assistant Commissioner alleged:

> An investigation was conducted pursuant to the NJ State Policy Prohibiting Discrimination in the Workplace (the "State Policy"). After a thorough investigation by the [ODC], Judge Audrey Kernan was found to have violated the State Policy. Please see attached determination letter for Judge Kernan.

2

A-1199-22

Attached to the complaint was the Assistant Commissioner's letter to Judge Kernan detailing ODC's findings.

In response to the CJP's "request[ for] witness statements and other evidence supporting the allegations against" Judge Kernan, the Commissioner provided the CJP with: (1) "witness statements that were taken as part of the [Equal Employment Opportunity] EEO investigation into allegations of harassment/discrimination . . . that resulted in . . . findings against Judge Kernan"; (2) an "alert . . . that after complaints were made against Judge Kernan, [she] retaliated against those that complained against her in several different ways"; (3) notice that in August 2012, "Judge Kernan previously agreed to a[] . . . settlement of charges against her"; (4) information that Judge Kernan hired a private investigator who "was granted access to an area reserved for staff" in the Workers' Compensation Court; (5) notice that Judge Kernan "wore a bodycam while at work"; (6) information that an EEO complaint had been filed but, "resolved by settlement"; and (7) notice that "a workplace violence complaint against Judge Kernan . . . [wa]s currently being investigated."

The Commissioner requested that the CJP "investigate this matter expeditiously and . . . consider the information contained herein and attached, along with the findings that were made in February 2019."

A-1199-22

The CJP wrote to Judge Kernan, attaching the verified complaint and advising that it determined the "complaint [wa]s not obviously unfounded or frivolous, or related solely to the subject of an appeal." Thus, the CJP requested that Judge Kernan "provide, within [twenty-one] days, a written response to the allegations made therein."

Judge Kernan asserted in response that: (1) the CJP matter "should be dismissed or stayed because it [was] based solely on . . . [the ODC's] . . . findings and conclusions [which we]re disputed and the subject of a pending appeal"; (2) the complaint was "an improper attempt to use [the CJP] as a cudgel with which to punish Judge Kernan simply because . . . [of] frustrat[ion with] the ODC['s] decision not to issue any . . . discipline . . . against Judge Kernan"; (3) the CJP "complaint should be dismissed because Judge Kernan did not violate State EEO discrimination policies or State discrimination laws"; and (4) the CJP "complaint should be dismissed because Judge Kernan did not violate the [C]ode of [C]onduct for [J]udges of [C]ompensation," citing N.J.A.C. 12:235-10.

The CJP advised Judge Kernan that it "[wa]s in the process of conducting an evidentiary review." The CJP explained, "you have the right to appear before [the CJP], with or without counsel, to confront and cross-examine witnesses and present evidence on your behalf; [and] to make a statement under oath as you

4

deem appropriate."  In addition, the CJP advised it would "consider the . . . letter of [the] Commissioner . . . along with the witness statements attached to that letter."

The CJP requested that Judge Kernan advise:  (1) "if [she] wish[ed] to exercise [her] right to appear before" the CJP; and (2) "which, if any witnesses [she] wish[ed] to cross[-]examine and any other evidence that [she] wish[ed] to examine."  The CJP stated it would tentatively "schedule [Judge Kernan's] appearance and arrange to have any evidence and/or witnesses available to [her] on a mutually convenient date."

In response, Judge Kernan:  (1) objected to the Commissioner's letter and the attached "confidential[] . . . EEO investigation documents"; (2) sought recusal of the CJP "because its members were appointed by and answer to [the] . . . Director . . . who in turn answers to the . . . Commissioner," and therefore "the[] interlocking relationships w[ould] serve to create an inherent and irremediable conflict of interest, and the actual or appearance of impropriety, and fatally taint the proceedings"; (3) contended that the "Commissioner . . . and Assistant Commissioner . . . ha[d] no standing before [the CJP] to bring an ethics complaint against Judge Kernan for alleged EEO violations"; (4) argued that the "Commissioner . . . and Ass[istant] Commissioner . . . violated New Jersey State

5

policy and regulation[s] when they released . . . confidential EEO statements";

and (5) claimed the Assistant Commissioner's "complaint should be dismissed because [the Assistant Commissioner] d[id] not possess personal knowledge of the matters complained of, and because the EEO documents . . . [we]re laden with impermissible hearsay and are not certified subject to penalty of law."

In the absence of dismissal, Judge Kernan requested an adjournment "to allow for adequate review and . . . until confrontation of witnesses may be done in person and the courts [we]re open."

The CJP met for its preliminary evidentiary review and considered all the submitted documents. Judge Kernan, with counsel, appeared and declined to testify or present any witnesses. By agreement, Judge Kernan submitted a certification from a retired Workers' Compensation Judge.

Judge Kernan presented oral argument for the dismissal of the Assistant Commissioner's complaint. In large measure, the arguments echoed the written objections previously submitted: (1) the CJP had "an irremediable conflict of interest"; (2) the complaint "unlawfully relie[d] on a breach of New Jersey's EEO confidentiality policies"; (3) the Assistant Commissioner "lack[ed] the requisite standing" "because she[ had] never appeared before Judge Kernan as a litigant, as an attorney, and ha[d] no personal knowledge whatsoever of the

A-1199-22

matters alleged in the Judicial Complaint"; (4) there was no "form or manner of punishment or reprimand," and the complaint "s[ought] to misuse th[e] Ethics Commission as a de facto enforcement arm . . . to e[x]act punishment against her"; and (5) "the complainants . . . failed to establish . . . Judge Kernan violated the official Code of Conduct for Judges of Compensation."

Judge Kernan argued that "should . . . [the CJP] find . . . that [she] violated a Code of Judicial Conduct, . . . after weighing and applying applicable mitigating factors, [it] should only issue minor private discipline." As to mitigating factors, Judge Kernan cited her "length and good quality of . . . tenure in office" and "exemplary personal and professional reputation." She "recogniz[ed] that she may have used a poor choice of words, that she may have engaged in conversations with those who prudence dictates should be avoided" and "recognize[d] things could have been handled better."

After completing its evidentiary review the CJP filed its recommendation with the Director. Initially, the CJP rejected the allegations of conflict of interest. While it noted its members were "appointed by the Director and the[ir] recommendations [we]re made to the Director," the CJP also noted its members were "appointed for a term"; "unsalaried and uncompensated"; and their service was "not a 'job' upon which any member w[as] dependent."

A-1199-22

The CJP stated that Judge Kernan "ma[de] a number of strong points concerning procedural issues involved in the case" and that her "arguments concerning the manner in which this case was presented to the CJP ha[d] merit." The CJP noted that since Judge Kernan was an employee in the DLWD, it could have administered discipline. However, instead, "it 'farmed out' the discipline to [the] CJP."

The CJP observed that the "ODC may have believed that the CJP could 'discipline' the individual" however, if it did, that was a "misapprehension of the CJP's obligations and procedures" because the "CJP has no enforcement powers."

Nonetheless, the CJP explained that allegations of "inappropriate conduct of judges in [the] workers' compensation system" must be handled by it, despite the "manner" in which the allegations were presented. The CJP stated it has its own "mandate and function" and could not "be bound by the ODC's conclusions concerning violations but must make its own determination as to judicial conduct." Therefore, the CJP was required to "obtain information relevant to its inquiry" and make "requests for underlying documents."

The CJP explained that in response to its requests, the Commissioner "included allegations of subsequent actions by [Judge] Kernan which were not

8

contained in the original complaint."  Nevertheless, "[a]ll of that information was included in the materials provided to [Judge] Kernan."

Further, while the CJP noted that Judge Kernan raised "interesting" questions, the CJP stated it could not "take action which [wa]s self-executing." Therefore, "[i]n the event of an adverse recommendation, the judge ha[d] available a procedural avenue during which those questions may be relevant."

The CJP stated that "[a]bsent live testimony and cross-examination," it "must use traditional means of assessing credibility:  consistency, corroboration and common sense to name a few."  Therefore, "[h]aving reviewed the statements . . . the CJP conclude[d] that the complainants [we]re credible.  The[] [complainant's] statements [we]re corroborated, consistent and me[]t the test of common sense."  On the contrary, Judge Kernan's "offered reasons to not believe the complainants [we]re such a far stretch as to defy common sense."

Thus, the CJP concluded:

> Judge Kernan's constant maligning of other judges to other judges and to members of the staff and in front of litigants serve[d] only to destroy confidence and trust in the integrity of the judiciary.
>
> The fact that judges and members of the staff [we]re fearful of interacting with her; in becoming her enemy; that they must set boundaries and limit their interaction with her is inimical to the proper functioning of the judiciary.  Her own lack of boundaries; choosing to deal

A-1199-22

with and chastise staff members interfere[d] with the functioning of the system.

These problems [we]re exacerbated by her position as a supervising judge. . . .

Judges who work "under" her [we]re entitled to receive a good example of demeanor and attention to the functioning of the court. They d[id] not receive it. Instead of using the power of her position to set an example of proper conduct, she wield[ed] in such a way as to cause fear and trepidation. Instead of being the judge to whom others could come with questions, she [wa]s the judge with whom they restrict[ed] their interaction.

Not only did Judge Kernan cross boundaries by attempting to control the clerical staff, she shared with clerical personnel her worst opinions of other judges, the former Director and attorneys who appeared in court. The clerical staff must deal with other judges and with members of the bar. That Judge Kernan would refer to judges as "corrupt"; a "snake"; a "thief"[;] and about to be "arrested" can only hamper the ability of the clerical staff to do their job and can only destroy confidence in the judiciary. That Judge Kernan could refer to members of the bar as "corrupt"; a "snake"; a "whore"; a "drunk" and to question and demean the sexuality of members of the bar is hardly the actions of someone who is temperate, attentive and impartial. Her making accusations to anyone, let alone clerical staff members who must deal with other judges and with attorneys, about members of the bench and bar are contrary to basic principles of proper judicial conduct.

In considering Judge Kernan's assertion that any recommendation should be mitigated "consider[ing the judge's] entire career," the CJP found "[t]he

10

problem with that argument [wa]s that [Judge] Kernan's history [wa]s not helpful to her at all."

Instead, the CJP noted: (1) "[a] number of years ago, [Judge Kernan] was the subject of another complaint before [the] CJP" that was resolved before the CJP "reach[ed] a conclusion and ma[de] a recommendation." However, the complaint still resulted in her being "suspended without pay for a period of six months and . . . [she] could not serve as a supervising judge for five years"; (2) in reference to a complaint involving another judge, Judge Kernan initially "clearly indicated an inappropriate pattern of behavior and an improper relationship" but "when [Judge] Kernan testified before the CJP . . . 'she backed away' entirely from those implications" and "[a]ll of the actions were [then] cast in an innocent light"; and (3) in another complaint regarding Judge Kernan, she (a) "switche[d] back and forth between acknowledging [an order of recusal] and/or denying its legitimacy"; (b) "maintained inconsistent positions with respect to the order"; (c) "only offer[ed] . . . unsubstantiated allegations which maligned and besmirched [the] former Director . . . and his status"; and (d) "shift[ed] explanations of her behavior" and her subsequent "dealing with [the CJP] cast[ed] doubt upon her ability to be candid."

A-1199-22

Therefore, "[h]aving reviewed all the evidence and made assessments as to credibility and having reviewed the applicable rules for judicial conduct," the CJP unanimously concluded that Judge Kernan should not "be a judge and exercise the power that she has to affect the lives of the members of the bench and their staff; the bar and the public." The CJP unanimously recommended that Judge Kernan "be removed from the bench."

The Commissioner wrote to Judge Kernan and provided a copy of the CJP's "recommendation for major discipline and institution of formal charges in connection with the . . . Assistant Commissioner['s]" complaint. The Commissioner advised Judge Kernan that she had a right to "request a final hearing by an independent hearing officer" and that the "hearing officer w[ould] make a recommendation to the Commissioner." Further, the Commissioner advised that "if no hearing ha[d] been requested, the Commissioner . . . shall make the final decision other than removal" or "[t]he Governor . . . upon recommendation of the Commissioner, may remove a judge from office" under the New Jersey State Constitution.

Thereafter, the Commissioner wrote to Judge Kernan and advised her that she was "suspended from all of [her] duties as a Judge of Compensation, with pay."

Judge Kernan, through new counsel, wrote to the Director and requested "a formal hearing in relation to the recommendation for major discipline." Further, she "request[ed] to participate in the selection process of the [h]earing [o]fficer." In addition, she requested confirmation that the "[h]earing [o]fficer w[ould] be empowered to issue subpoenas for . . . witness[] attendance at the formal hearing" and "request[ed] the ability to engage in formal discovery prior to the hearing, including the taking of depositions, exchange of interrogatory questions and propounding of documents."

A hearing officer was selected and he held several conferences with the parties. The parties engaged in discovery. Nonetheless, Judge Kernan informed the hearing officer that "she ha[d] decided to withdraw the request for a hearing under N.J.A.C. 12:235-10.9." She advised she had "elected to pursue a civil action."

The Commissioner wrote to the Governor and "recommend[ed] that Judge Kernan be removed from office." The Commissioner detailed the history of the matter and stated that "the procedures established by N.J.A.C. 12:235-10.9 provide[d] that the Governor may remove a judge from office based upon the underlying record where no hearing [wa]s requested (or, as in this case, the request for a hearing [wa]s withdrawn)." Therefore, the Commissioner

13

"recommend[ed] that Judge Kernan be removed from office based upon the findings set forth in the CJP report."

The Governor wrote to Judge Kernan:

> This letter is to inform you that based upon your withdrawal of your request for a hearing on the [CJP] recommendation that you be removed from office, I am hereby notifying you that you will be removed as a Workers['] Compensation Judge effective August 12, 2022, in accordance with N.J.A.C. 12:235-10.9. As you know, the CJP recommended that you be removed from office. By letter dated June 21, 2022, you withdrew your request for a hearing of these findings. As such, you are hereby notified that you will be removed from office based upon the findings set forth in the CJP Report effective August 12, 2022,

By letter from her counsel, Judge Kernan requested that the Governor reconsider the removal. She claimed that she had "a constitutional right to a public hearing before [the Governor] prior to the termination of her employment." Thus, her "withdrawal from the N.J.A.C. [12:235-10.9] hearing d[id] not simultaneously withdraw [her] from her right to a constitutional hearing." Judge Kernan contended that "the New Jersey State Constitution mandate[d] that only the [G]overnor can suspend a judge of compensation and only after a public hearing." She asserted "the constitutional power to remove a judge of compensation is vested exclusively in the [G]overnor, after a public hearing on the issue of removal."

14

Therefore, she claimed, her "[w]ithdraw[al] from the N.J.A.C. 12:235-10.9 [hearing] d[id] not, because it c[ould ]not, act to automatically waive . . . [her] constitutional right to be heard at a public hearing before being removed." Moreover, her withdrawal from the N.J.A.C. 12:235-10.9 hearing did "not replace the Governor's requirement to provide . . . Judge Kernan with a public hearing." Judge Kernan added that she had "never been afforded her basic right of cross[-]examination of witnesses related to this removal."

The Governor denied Judge Kernan's request for reconsideration. In a written response, his Chief Counsel explained:

> the Governor [wa]s satisfied that his decision to remove Judge Kernan was made in adherence to all applicable regulatory, statutory and constitutional principles. In particular, Judge Kernan was afforded the right to a public hearing under N.J.A.C. 12:235-10.9 and indeed availed herself of this process, which continued until June 21, 2022, when Judge Kernan withdrew her request for a public hearing and stated that she ha[d] elected to pursue a civil action. As such, Judge Kernan waived her right to an administrative public hearing as provided for in the New Jersey State Constitution.

Judge Kernan then filed a verified complaint in the Law Division for an action in lieu of prerogative writs. Judge Kernan claimed: (1) the Commissioner's action in suspending her was "ultra vires and unenforceable as

15

a violation of the" Rules; and (2) her removal by the Governor was "ultra vires and unenforceable as a violation of the New Jersey State Constitution."

The Law Division judge denied Judge Kernan's request for an injunction, concluding that she had "not clearly and convincingly shown irreparable harm." Defendants moved to dismiss the complaint and the Law Division judge, citing N.J.S.A. 52:14-17.2 and Rule 1:13-4, transferred the matter to the Appellate Division.

On appeal, Judge Kernan argues: (I) N.J.A.C. 12:235-10.1 to -10.11 fails—facially and as applied to her—to satisfy the mandate of Article V, Section IV, Paragraph 5 of the New Jersey State Constitution; (II) Workers' Compensation Judges perform the identical tasks as superior and municipal court judges and therefore, the removal process should be similar; (III) she was denied fundamental due process in the CJP and the administrative hearing; and (IV) the requirement that she exhaust administrative remedies should be "dispens[ed] with" because her continued participation in the administrative hearing was "futile" since "the Commissioner was still going to be the one to

make the final recommendation to the Governor, and [the Commissioner's] opinion on the matter was clearly expressed at the start of the CJP process."[1]

## I.

Our analysis begins with the framework for the removal of a Workers' Compensation Judge. Only the Governor may remove a Workers' Compensation Judge from the bench. The issue of removal can reach the Governor in two separate but, at times, interrelated circumstances: (1) under the Rules of the Division of Workers' Compensation, N.J.A.C. 12:235-10.1 to -10.11 (Rules); and (2) under Article V, Section IV, Paragraph 5 of the New Jersey State Constitution. In both circumstances, the Governor's authority for removal is effectuated under the Constitution.

Under the Constitution, the Governor "may cause an investigation to be made of the conduct in office of any officer or employee who receives his [or her] compensation from the State of New Jersey." N.J. Const. art. V, § IV, ¶ 5.

---

[1] In their opposition brief, defendants argue that Judge Kernan's "appeal should be dismissed because she failed to timely challenge the Governor's determination to remove her and because, to this date, the record does not reflect that Judge Kernan served her notice of appeal upon the Secretary of State as required by law." See N.J.S.A. 52:14-17.3. We decline to consider this argument, raised in defendants' brief, rather than in a cross-appeal, see Franklin Discount Co. v. Ford, 27 N.J. 473, 491 (1958) ("we have held that a party, in order to attack the actions . . . which were adverse to him, must pursue a cross-appeal"); or motion to dismiss the appeal. R. 2:8-2.

As part of that investigation, the Governor "may require such officers or employees to submit to him a written statement or statements, under oath, of such information as he may call for relating to the conduct of their respective offices or employments." Ibid. Then, "[a]fter notice, the service of charges and an opportunity to be heard at public hearing the Governor may remove such officer or employee for cause." Ibid.

When the Governor orders the removal of "[a]ny officer, or employee of this State . . . pursuant to Article V, Section IV, paragraph five, of the Constitution" the officer "may appeal from the order of removal to the Appellate Division of the Superior Court as in the case of an appeal from a final decision of a State administrative agency." N.J.S.A. 52:14-17.2.

The Appellate Division:

> may affirm the order of removal, or . . . may reverse or nullify the same and order the reinstatement of the appellant to the office or position of employment from which he [or she] was removed, as of the date of removal, or as of such date as [we] may determine, upon the determination of a matter of law or when it clearly appears that there was no evidence before the Governor reasonably to support the order of removal.
>
> [N.J.S.A. 52:14-17.10.]

When reviewing the removal of an executive branch officer, the standard of review is "[n]othing less than the standard of substantial justice." Russo v. Governor of State, 22 N.J. 156, 168 (1956).

The Rules provide another procedure that could lead to the Governor's removal of a Workers' Compensation Judge. Under the Rules, the CJP "investigate[s] complaints or reports referred by the Director concerning judicial conduct and . . . give[s] advisory opinions, recommendations, and reports to the Director." N.J.A.C. 12:235-10.5(a).

"The [CJP] . . . conduct[s] an initial review upon receipt of a written complaint or report . . . ." N.J.A.C. 12:235-10.6(a). "Prior to any meeting to decide the merits of the complaint or report, the [CJP is required to] send a copy of the complaint or report to the judge who is the subject of the review." N.J.A.C. 12:235-10.6(b).

The CJP shall:

> 1. Require the filing of a verified complaint or report;
>
> 2. Notify the judge of the nature of the complaint or report and the name of the person making the complaint or report, provide a copy of the complaint or report, and notify the judge that he or she has the opportunity to present . . . such matters as the judge may choose to place on the record. . . . A presentation by the judge includes the right to appear before the [CJP] . . . to confront and cross-examine witnesses and present

19

> evidence on his or her behalf and to make a statement
> under oath as the judge deems appropriate.
>
>     . . . .
>
> [N.J.A.C. 12:235-10.7.]

Thereafter, if the CJP "concludes, . . . only after an evidentiary review under N.J.A.C. 12:235-10.7, that the basis of the complaint or report merits disciplinary action greater than minor discipline[—like 'removal' under N.J.A.C. 12:235-10.2(a)(4) and N.J.A.C. 12:235-10.4—]and that formal charges should be instituted, the [CJP] shall promptly file a copy of the recommendation and the record . . . with the Director."  N.J.A.C. 12:235-10.8(a)(5).  The CJP "shall . . . serve upon the judge a notice advising him or her that it has filed such a recommendation with the Director."  Ibid.

"The record before the [CJP] shall be confidential and shall not be available to any person . . . unless the judge requests that the charge, proceedings, or action shall be made public."  N.J.A.C. 12:235-10.10.  Further, "[t]he entire record shall, unless the Director otherwise orders, be made public upon the entry of a final decision imposing a public reprimand, suspension, or removal."  Ibid.

Then,

A-1199-22

[w]hen requested by the judge, a final hearing in major discipline shall be conducted by an independent hearing officer under procedures set by the hearing officer. The hearing officer will make a recommendation to the Commissioner. As feasible and as permitted by law, the hearing officer shall be a retired judge of the Superior Court. At the hearing, the Department may be represented by the Attorney General or a designated representative. After recommendation of the hearing officer or on the record if no hearing had been requested, the Commissioner shall make the final decision in all cases other than removal. The Governor, pursuant to Art. V, Sec. IV, Par. 5 of the New Jersey Constitution and upon recommendation of the Commissioner, may remove a judge from office.

[N.J.A.C. 12:235-10.9.]

As stated, if the Governor accepts the recommendation for removal, the Workers' Compensation Judge may appeal that decision to the Appellate Division, see N.J.S.A. 52:14-17.2; and we may "affirm"; "reverse"; or "nullify"; the removal and "order . . . reinstatement" if we "determin[e as] a matter of law or when it clearly appears that there was no evidence before the Governor reasonably to support the order of removal." N.J.S.A. 52:14-17.10. The standard of review is "[n]othing less than the standard of substantial justice." Russo, 22 N.J. at 156.

Here, the Governor's removal of Judge Kernan meticulously followed the procedures provided under the Rules. Judge Kernan argues that the Rules

"facially" and "as applied to her" failed to satisfy the constitutional mandate. We disagree.

A.

In her facial challenge, Judge Kernan contends the Rules: (1) are "directly at odds with the Constitution with regard to the conduct of the hearing—whereas the former requires complete confidentiality and closed proceedings (both before the CJP and the [h]earing [o]fficer) the latter compels a public hearing and a full adversary trial"; (2) "completely divorce[] the Governor from the entire process, ex[cept] the final pro forma act of issuing a decision in accordance with the Commissioner's recommendation"; and (3) create an "inherent conflict" because "the members of [the] CJP were appointed by and answer to [the] Director . . . who in turn answers directly to the Commissioner, the complaining party" and, "even if these obstacles were surmountable," the Commissioner "advocates for removal at the very start [and] gets to make the final recommendation to the Governor." We conclude there is no merit in Judge Kernan's facial challenge to the Rules.

First, the Rules provide Judge Kernan with the right to "request[] that the . . . proceedings shall be made public." N.J.A.C. 12:235-10.10. We construe this language to provide for a request for a public hearing. Indeed, we decline

to read this provision—as Judge Kernan suggested during oral argument before this court—to merely allow a judge to request the record of the proceedings be made public after they are concluded, because the Rule already provides that the "entire record shall . . . be made public upon the entry of a final decision imposing . . . removal." Ibid. Judge Kernan's interpretation reads a redundancy into the Rule. "Courts are to avoid constructions which make statutory provisions redundant." In re 1984 General Election for Office of Council, 203 N.J. Super. 563, 597-98 (App. Div. 1985).

Moreover, under N.J.A.C. 12:235-10.9, when a judge requests a hearing "by an independent hearing officer" there is no requirement for "closed proceedings" as suggested by Judge Kernan. Instead, the hearing is to be "conducted under procedures set by the hearing officer." N.J.A.C. 12:235-10.9. We are satisfied that if Judge Kernan did not waive her right to the hearing, her request that the hearing be conducted in public would have been granted. Indeed, the State acknowledges "[n]othing in the [R]ule forecloses a public proceeding."

Thus, since the Rules provide for public hearings—at the CJP and hearing officer stages—they are not at odds with the Constitution.

Second, the Rules do not "divorce" the Governor from the removal process nor do they render his act of removal "pro forma." Judge Kernan's position trivializes the Governor's role. The Governor's decision can be informed by the hearing officer's recommendation or the record if—as happened here—there was no hearing. In addition, the Governor could exercise his constitutional investigatory powers—even after being provided with the record—if the Governor determined the record was incomplete or required supplemental information. However, in the end, the decision to remove is the Governor's and the decision is not a mere pro forma step.

Third, Judge Kernan argues that the CJP had a conflict of interest because the Commissioners were appointed by the Director who in turn answered to the Commissioner. Moreover, the judge suggests there is a conflict because the Commissioner made the complaint and made the recommendation to remove to the Governor.

We are satisfied the CJP appropriately addressed this issue in their recommendation. The CJP explained they were "appointed for a term"; "unsalaried and uncompensated"; and their service was "not a 'job' upon which any member w[as] dependent"; which dispels any notion that they were conflicted in their decision-making processes.

24

Moreover, in suggesting there was a conflict because the Commissioner brought the complaint against Judge Kernan and recommended the judge's removal, Judge Kernan ignores the roles of the CJP and the independent hearing officer. In addition, while the Governor's decision to remove is based on recommendation, the decision for removal is the Governor's alone.

Lastly, we have recognized that "[t]he proceedings by N.J. Const. (1947), [a]rt. V, § IV, [¶] 5 . . . for the removal of . . . any Judge of Compensation vest authority in and may be instituted only by the Governor, [and] the Commissioner." Middlesex Cnty. Bar Ass'n v. Parkin, 226 N.J. Super. 387, 392-93 (App. Div. 1988).

### B.

In her as-applied challenge to the Rules, Judge Kernan contends: (1) her suspension by the Commissioner was an ultra vires act contrary to our decision in Grzankowski v. Heymann, 128 N.J. Super. 563 (App. Div. 1974); (2) she was never served with formal charges; (3) the hearing officer, despite "permitt[ing] some discovery," denied her "the right to engage in meaningful discovery"; (4) "[t]he State was . . . never required to present live witnesses . . . at either the CJP or the" hearing officer stage; (5) the Commissioner "expressed clear and obvious bias"; and (6) "the act of removal here [wa]s ultra vires because the Governor

25                                                                    A-1199-22

never executed an Executive Order of Removal as required by N.J.S.A. []52:14-17.2." We find these arguments unavailing.

First, in <u>Grzankowski</u>, we held "the Commissioner does have the power under N.J.S.A. 34:1A-3(b)[2] to d[i]scipline departmental employees through a short-term suspension." <u>Id.</u> at 569. However, we "reversed and . . . remanded for further proceedings" because "the Commissioner suspended [the Workers' Compensation Judge] without the issuance of formal charges or a public hearing." <u>Ibid.</u>

Judge Kernan's reliance on <u>Grzankowski</u> is misplaced. First, unlike in <u>Grzankowski</u>, Judge Kernan was not suspended until after the CJP issued its recommendation, in other words, after the CJP conducted its evidentiary review and after the judge was served with the verified complaint and supplemental materials provided by the Commissioner. Second, N.J.A.C. 12:235-10.2(b) provides: "[a] judge may be suspended by the Commissioner with or without pay pending the outcome of the disciplinary process . . . ."

---

[2] N.J.S.A. 34:1A-3 provides: "The commissioner, as head of the department, shall: . . . (b) [a]ppoint and remove officers and other personnel employed within the department, subject to the provisions of Title 11 of the Revised Statutes, Civil Service, and other applicable statutes, except as herein otherwise specifically provided."

Second, we are satisfied that Judge Kernan was served with the verified complaint and all supplemental materials. Her contention that she was not served is belied by the record.

Third, Judge Kernan acknowledges discovery was permitted but argues she was denied "meaningful" discovery. She provides no clarity on what she considered to be meaningful discovery, as opposed to what she was provided.

Judge Kernan contends that the hearing officer denied her request for depositions. The judge argues she needed depositions "for effective cross-examination." However, the judge fails to explain why the record, including statements, provided an unsatisfactory basis for cross-examination. Moreover, the judge's waiver of the hearing renders this claim specious.

Fourth, Judge Kernan's contention that the State was never required to present live witnesses at either the CJP or hearing officer stage is undermined by the record. When the CJP advised Judge Kernan of the complaint and its intention to conduct an evidentiary hearing it explained, "you have the right to appear before [the CJP], with or without counsel, to confront and cross-examine witnesses and present evidence on your behalf; to make a statement under oath as you deem appropriate."

A-1199-22

In addition, the CJP requested that Judge Kernan advise: (1) "if [she] wish[ed] to exercise [her] right to appear before" the CJP; and (2) "which, if any witnesses [she] wish[ed] to cross[-]examine and any other evidence that [she] wish[ed] to examine." The CJP stated it would tentatively "schedule [Judge Kernan's] appearance and arrange to have any evidence and/or witnesses available to [her] on a mutually convenient date."

Moreover, while the "final hearing in a major discipline shall be conducted . . . under procedures set by the hearing officer"; there is nothing in the record to suggest the hearing officer's procedures would not have permitted witness testimony. N.J.A.C. 12:235-10.9. Again, Judge Kernan's decision to not participate in the hearing renders this claim hollow.

Fifth, Judge Kernan asserts that the Commissioner "expressed clear and obvious bias" because the Commissioner "laid out precisely what he wanted the [CJP] to find" and "had the power to 'make the final decision in all cases other than removal.'" However, Judge Kernan's assertion is misplaced because the discipline—removal—could only be effectuated by the Governor and not the Commissioner. In addition, the complaint was reviewed by the CJP and would have been reviewed by the independent hearing officer. Thus, Judge Kernan's

28

arguments minimize the roles of the CJP, the hearing officer, and the Governor, and overinflates the influence of the Commissioner.

Lastly, Judge Kernan asserts that the Governor's "act of removal . . . [wa]s ultra vires because the Governor never executed an Executive Order of Removal as required by N.J.S.A. []52:14-17.2." She argues "[a] simple letter of termination, where the Governor's signature [wa]s affixed by rubber stamp, [wa]s insufficient."

However, the statute merely requires an "order of removal" not an Executive Order. N.J.S.A. 52:14-17.2. In addition, the Constitution does not require an order at all and, instead, simply states "the Governor may remove." N.J. Const. art. V, § IV, ¶ 5.

Further, aside from Judge Kernan's argument regarding the form of the order, she fails to assert any deficiency in the Governor's writing. The Governor: (1) explained he was removing Judge Kernan as a result of her withdrawal from the hearing process; (2) reminded Judge Kernan that the "CJP recommend[ed] that [she] . . . be removed from" office; and (3) advised Judge Kernan "that [she] w[ould] be removed from office based upon the findings set forth in the CJP Report." Therefore, the Governor provided Judge Kernan notice of his action and the reasoning underpinning this action. Nothing more was required.

## II.

Judge Kernan argues that because Workers' Compensation Judges perform identical tasks as superior and municipal court judges, a Workers' Compensation Judge's removal should be conducted with similar protections.  We disagree.

"Of course, the Legislature has clothed a judge of compensation with most of the trappings of judicial office."  Bonafield v. Cahill, 125 N.J. Super. 78, 84 (App. Div. 1973).  Indeed, the judge "has substantially the same duties and disabilities as a recognized judge."  Ibid.

However, "[j]udges of compensation are purposely excluded from disciplinary control by the Supreme Court."  Id. at 85.  "This omission is a clear recognition by the Legislature that such judges are regarded as employees of the executive department and subject to existing procedures for suspension and removal."  Ibid.  (citing N.J. Const. art. V, § IV, ¶ 5.).

## III.

Judge Kernan contends she was denied fundamental due process in the CJP and the administrative hearing.  We disagree.

## A.

Judge Kernan argues her tenure status provided her with "a constitutionally protected property interest . . . entitling [her] to procedural due

process protection," relying on <u>Keim v. Cnty. of Bucks</u>, 275 F. Supp. 2d 628, 633 (E.D. Pa. 2003).

The New Jersey Supreme Court has recognized that "tenure employment" creates a "property interest." <u>Nicoletta v. N. Jersey Dist. Water Supply Com.</u>, 77 N.J. 145, 154 (1978) (citing <u>Slochower v. Bd. of Higher Educ.</u>, 350 U.S. 551 (1956)). "In determining the procedures required to address and protect . . . [property] interests, we apply the analysis set forth by the United States Supreme Court in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976)." <u>J.E. ex rel. G.E. v. State</u>, 131 N.J. 552, 566 (1993).

> The <u>Mathews</u> three-pronged test requires that we consider (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the agency procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the State's interest, including the fiscal and administrative burdens that the additional procedural safeguards would entail.
>
> [<u>Id.</u> at 566-67 (citing <u>Mathews</u>, 424 U.S. at 335).]

Judge Kernan argues she was denied procedural due process in the CJP because: (1) she was "present[ed] . . . with a limited complaint containing only two violations and then compel[led] . . . to respond to factual allegations that ha[d] never been disclosed"; (2) while she "ostensibly had the right to 'cross-examine' witnesses . . . , [it] was an empty right, amounting to a sham" because

31

the witnesses were not compelled to testify under oath and she "was denied the right to conduct depositions"; and (3) the Commissioner was "the de facto decision maker, while the Governor act[ed] on his recommendation, neither of which would actually see any cross-examination."

Moreover, Judge Kernan contends she was denied procedural due process in the independent hearing officer's proceeding because: (1) she was never served with formal charges; (2) "the State was never going to be compelled to put forth a prima facie case"; and (3) "[t]he hearing officer even denied [her] the mere right to conduct depositions."

Judge Kernan's procedural due process argument is unavailing. "Due process is a flexible concept that calls for such procedural protections as fairness demands." Mettinger v. Glob. Slicing Mach. Co., 153 N.J. 371, 389 (1998). "The essential components of due process are notice and an opportunity to be heard." Ibid. "Thus, a party's due process rights are not violated . . . arising out of an action in which it participated or had the opportunity to be heard." Ibid.

Further, the State "cannot be held to have violated due process requirements when it ha[d] made procedural protections available and [the individual] . . . simply refused to avail [themselves] of them." Plemmons v.

32

Blue Chip Ins. Servs., Inc., 387 N.J. Super. 551, 567 (App. Div. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d. Cir. 2000)).

Judge Kernan: (1) received all of the filings made with the CJP; (2) had the right to appear before the CJP and confront and cross-examine witnesses, present evidence on her own behalf, and make a statement under oath; (3) exercised her right to a final hearing with an independent hearing officer; and (4) was provided with discovery in the final hearing process. The judge was afforded more than ample due process in the proceedings. In addition, her procedural due process claims lack credibility considering she waived most of her rights at the CJP and waived her right to the formal hearing with the independent hearing officer.

B.

Judge Kernan contends that "even if the procedures passed constitutional muster, the objective facts reveal an arbitrary or irrational deprivation" of her substantive due process rights.

"In its most characteristic form, substantive due process is reserved for 'state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning and harmful as literally to shock the conscience of a court.'" Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 365 (1996)

(quoting Ramos v. Gallo, 596 F. Supp. 833, 837 (D. Mass. 1984)). "[S]ubstantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.'" Id. at 366 (second alteration in original) (quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989)).

Judge Kernan argues "this entire process commenced with two allegations"—she referred to a judge "as suffering from Small Penis Syndrome" and stated another judge "'only has her job because she is a black woman'"—and "these minimal violations d[id] not equate to conduct worthy of removal."

We need not decide whether these two comments—alone—would suffice for removal because Judge Kernan's removal was based on a substantial body of additional and uncontroverted evidence as detailed in the CJP's recommendation. Under the substantive due process standard, Judge Kernan's removal does not shock the conscience.

IV.

Judge Kernan argues that the requirement that she exhaust administrative remedies should be "dispens[ed] with" because her continued participation in the administrative hearing was "futile" since "the Commissioner was still going

34

to be the one to make the final recommendation to the Governor, and [the Commissioner's] opinion on the matter was clearly expressed at the start of the CJP process."

The New Jersey Supreme Court has noted:

> the doctrine of exhaustion of administrative remedies serves three primary goals: (1) the rule ensures that claims will be heard, as a preliminary matter, by a body possessing expertise in the area; (2) administrative exhaustion allows the parties to create a factual record necessary for meaningful appellate review; and (3) the agency decision may satisfy the parties and thus obviate resort to the courts.

> [Atl. City v. Laezza, 80 N.J. 255, 265 (1979).]

However, the Court has also held that "[t]he exhaustion doctrine is not an absolute." Abbott v. Burke, 100 N.J. 269, 298 (1985) (quoting Garrow v. Elizabeth Gen. Hosp. and Dispensary, 79 N.J. 549, 561 (1979)). Instead, "[e]xceptions exist when only a question of law need be resolved," or "when the administrative remedies would be futile." Ibid. In Naylor, the New Jersey Supreme Court held "where th[]e remedies are futile, illusory or vain, elemental considerations of justice will dictate that the courts reject their invocation as a barrier to judicial relief against arbitrary or illegal action." Naylor v. Harkins, 11 N.J. 435, 444 (1953).

35

Judge Kernan raised issues that went beyond mere questions of law. Moreover, again, Judge Kernan's futility argument overinflates the influence of the Commissioner and minimizes the roles played by the CJP, the independent hearing officer, and the Governor.

Further, Judge Kernan's decisions—to not meaningfully participate at the CJP and to withdraw from the final hearing before the independent hearing officer—did not stymie the creation of a factual record or prevent a meaningful review. Indeed, a record and recommendation were developed and ultimately presented to the Governor.

We conclude Judge Kernan was provided with substantial justice and the record presented to the Governor reasonably supported the order of removal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1199-22